IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YVONNE BOUGHTER <u>et al.</u>         *
                                      *
v.                                    *
                                      *     Civil Action No. WMN-09-1689
TOWN OF OCEAN CITY, MARYLAND          *
DEPARTMENT OF EMERGENCY               *
SERVICES FIRE/EMS DIVISION            *
<u>et al.</u>                         *
                                      *

   *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

<u>**MEMORANDUM**</u>

Before the Court is Defendants' motion to dismiss.  Paper
No. 10.  The motion is fully briefed.  Upon review of the motion
and the applicable case law, the Court determines that no
hearing is necessary, Local Rule 105.6, and that the motion will
be granted.

## I. BACKGROUND

This action arises out of a tragic carbon monoxide
poisoning that occurred on the morning of June 26, 2006.  On
that morning, Yvonne and Patrick Boughter and their two
daughters, Morgan and Kelly, were staying at the Days Inn in
Ocean City, Maryland.  As alleged in the Complaint, at about
9:43 am, Yvonne Boughter awoke to observe her family ill with
daughter Morgan vomiting and husband Patrick also vomiting and
having difficultly talking.  Ms. Boughter called 911 from her
cell phone and the call was transferred to the Ocean City

Department of Emergency Services-Fire/EMS Division.  She informed the 911 operator that her whole family was sick and vomiting, that her husband was "really sick" and unable to speak, and that they were staying in Room 121 at the Days Inn on the Boardwalk.  She also provided her full name and cell phone number.  The operator responded that paramedics would be sent.

About 15 minutes before Ms. Boughter placed her 911 call, another family staying in the rooms immediately adjacent to the Boughters, Rooms 125 and 127, also called 911 complaining of illness.  According to the Complaint, the transcripts of communications amongst emergency personnel indicate that they were aware that Ms. Boughter's call was a "second call, different room at the Days Inn Hotel, Room 121 for sick subjects experiencing similar things, also four patients."  Compl. ¶ 27. After making the call, Ms. Boughter slipped into unconsciousness.

The Complaint alleges that, upon information and belief, Emergency Unit #7505, consisting of Defendants Brooks Morris and Bryon Trimble and possibly some other Doe Defendants, was dispatched to respond to Ms. Boughter's 911 call.  Emergency unit #7505 failed, however, to respond to Room 121 to give assistance to the Boughter family.  Although the Complaint does not explicitly so state, there is the implication that it responded instead to the individuals in the adjacent rooms that

2

made the previous 911 call.  Regardless, the Complaint alleges that Emergency Unit #7505 left the hotel without ever checking on Room 121.

About four hours later, at around 1:53 p.m., Ms. Boughter awoke again and called 911.  She stated that "I called you earlier and nobody came yet" and went on to report that she believed that her husband and one daughter had already died.  An emergency team was dispatched at 1:58 p.m. and arrived at the Days Inn at about 2:02 p.m.  By that time, however, Patrick and Kelly Boughter had died of carbon monoxide poisoning.

Plaintiffs, Yvonne Boughter (individually and as the representative of the estates of Patrick and Kelly Boughter) and Morgan Boughter, bring this action against the Ocean City Department of Emergency Services-Fire/EMS Division, Morris, Trimble, and John Does Defendants.  They allege that Defendants acted with gross negligence leading to the deaths of Patrick and Kelly and the injury to Yvonne and Morgan.  That gross negligence included: failing to check and enter Room 121, failing to call Ms. Boughter's cell phone to ensure that the family was safe; failing to evacuate the rooms on the first floor of the hotel once observing the symptoms of carbon monoxide poisoning in the guests in the adjacent rooms, and failing to accurately convey and receive information concerning Ms. Boughter's first 911 call.

3

Defendants have moved to dismiss the Complaint arguing
that, under Maryland law, there was no "special relationship"
between Defendants and the Boughters that could give rise to a
duty of care.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint
must contain sufficient factual matter . . . to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal, -
-- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim
has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).
"Detailed factual allegations" are not required, but allegations
must be more than "labels and conclusions," or "a formulaic
recitation of the elements of a cause of action[.]"  Iqbal, 129
S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).  "[O]nce a
claim has been stated adequately," however, "it may be supported
by showing any set of facts consistent with the allegations in
the complaint."  Twombly, 550 U.S. at 563.  In considering such
a motion, the court is required to accept as true all well-pled
allegations in the Complaint, and to construe the facts and
reasonable inferences from those facts in the light most

4

favorable to the plaintiff.  Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

## III. DISCUSSION

Under Maryland law,[1] "[t]o maintain an action in negligence, a plaintiff must assert in the complaint the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." Valentine v. On Target, Inc., 727 A.2d 947, 949 (Md. 1999) (internal quotations omitted). "Duty" in negligence is defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Ashburn v. Anne Arundel County, 510 A.2d 1078, 1083 (Md. 1986).  The only issue raised in the pending motion is whether Maryland law recognizes a duty that would run from emergency medical responders to the Boughter family under the facts alleged in the Complaint.

As there has been no reported decision in Maryland directly addressing the duty owed by emergency medical personnel, Plaintiffs and Defendants appropriately turn to decisions discussing the duty owed by other emergency responders,

---

[1] Under Erie R.R. Co. v. Thompkins, 304 U.S. 64 (1938), a federal court in a diversity action must apply the substantive law of the state in which it sits.

including police officers, police dispatchers, and 911
operators.  In defining the duty owed by police officers to
persons in need of assistance, the Maryland Court of Appeals, in
Ashburn, applied the "public duty doctrine."  Under this
doctrine, the duty imposed upon a public official, like a police
officer, is generally considered to be owed to the public at
large, and not to a particular class of individuals.  Thus, "a
breach of that duty is most properly actionable by the public in
the form of criminal prosecution or administrative disposition,"
and not by a private tort action.  510 A.2d at 1084.

     This public duty doctrine, however, is not without
exception.  Where a plaintiff "alleges sufficient facts to show
that the defendant policeman created a 'special relationship'
with him upon which he relied, he may maintain his action in
negligence."  Id. at 1085.  In order for a special relationship
between police officer and an individual to be found, Maryland
courts require that it "be shown that the local government or
the police officer affirmatively acted to protect the specific
victim or specific group of individuals like the victim, thereby
inducing the victim's specific reliance upon the police
protection."  Id. at 1085 (emphasis added).

     In Ashburn, a police officer came upon a clearly
intoxicated individual sitting behind the wheel of a pickup
truck, with engine running, on the parking lot of a convenience

store.   Rather than arrest the individual, which he could have done under Maryland law, the officer simply told the driver to pull his vehicle to the side of the lot and discontinue driving for the evening.   As soon as the officer left the scene, however, the driver left the lot, drove a short distance, and struck a pedestrian.   The pedestrian brought a negligence suit against the officer.   The Maryland Court of Appeals affirmed the trial court's dismissal of the suit on the ground that that there was no "special relationship" between the officer and the pedestrian.

In Fried v. Archer, 775 A.2d 430 (Md. Ct. Spec. App. 2001), the Maryland Court of Special Appeals applied Ashburn's "public duty doctrine" and "special relationship" test to a negligence suit brought against a 911 employee.   In Fried, a teenage girl, Tiffany, was sexually assaulted by several other teenagers and left unconscious in the woods behind some townhouses on a cold, rainy night.   Her assailants, aware that she was in danger of exposure, called 911 and reported that a girl was laying in the woods to the rear of "1436" Harford Square "K Court."   She was actually behind 1443 K Court, but the assailants invented the street number to prevent the police from coming to their residence.   The dispatcher told the caller that she would "send someone out" but erroneously directed the responding police officers to 1436 "J" Court.   The officers searched behind the

entire row of townhomes on J Court, did not find the girl, and
then discontinued the search.  Tiffany was found the next day,
dead from hypothermia.

In affirming the trial court's dismissal of the negligence
claim against the police dispatcher who took the 911 call, the
Court of Special Appeals held:

> that the tort duty owed by police dispatchers must be
> determined by applying the same "special duty rule"
> that governs the tort liability of other public and
> private defendants.  Applying that rule, we hold that
> [the dispatcher] did not have a special duty to rescue
> Tiffany, because Tiffany, who was unconscious, did not
> specifically rely on [the dispatcher]'s promise to
> "send someone out," and because the assailants who
> called on her behalf did not justifiably rely on that
> promise.  Thus, [the dispatcher] did not have a
> "special relationship" with Tiffany, or a special duty
> to aid, protect, or rescue Tiffany.  Because appellant
> cannot establish that [the dispatcher] had a private
> duty to Tiffany, the trial court properly dismissed
> appellant's negligence claims against Archer.

775 A.2d at 435.

In affirming this decision, the Maryland Court of Appeals
began by observing that "the legal duty owed by 911 employees
'by virtue of their position is also a public duty to aid,"
similar to that of police officers.  Muthukumarana v. Montgomery
Co., 805 A.2d 372, 397 (Md. 2002).[2]  Thus, an individual
plaintiff must establish that the 911 employee "owed him or her
a special duty, based on the existence of a special relationship

---

[2] Fried was consolidated for appeal with another decision raising
similar issues, Muthukumarana v. Montgomery Co.

between the two," before the employee can be found liable to the individual in tort for the negligent performance of his or her duties.  Id. at 399.  The Court then reviewed decisions from other jurisdictions that formulated various tests for determining whether such a special relationship exists. Rejecting that kind of formulaic approach, the Court of Appeals held that "[w]e continue to believe that the intent of the "special relationship" doctrine is better addressed by our general standard outlined in Ashburn because it preserves our ability to determine whether a special relationship exists on a case-by-case basis.  Id. at 401 (internal quotations omitted).

In applying that case-by-case analysis to the facts before it, the Muthukumarana court found that no "affirmative action" was taken to protect or assist Tiffany or a specific group of individuals like Tiffany.  The plaintiff, Tiffany's mother, argued that receiving the 911 call and stating that the dispatch system would "send someone out" was sufficient to constitute an affirmative act to protect or assist Tiffany.  Id. at 498.  The Court of Appeals flatly rejected that argument, holding that "'neither a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to

the person in need of such assistance.'"  <u>Id.</u> (quoting <u>Fried</u>,
775 A.2d at 448).[3]

The court continued and opined that it was unable to
conclude that the answering and handling of the 911 call
"constituted an act to protect or assist a specifc group of
individuals like Tiffany."  805 A.2d at 403.

_____

[3] The Court of Appeals also cited a number of decisions from
other jurisdictions for the proposition that the receipt of a
911 call, the promise to send help, and the dispatch of
emergency services is not enough to create a special
relationship:

> <u>Morgan [v. District of Columbia]</u>, 468 A.2d [1306,]
> 1313 [(D.C. 1983)] (finding that a special
> relationship is not created "when the police
> gratuitously promise to provide protection. . . .
> Reassuring a citizen victimized by criminal conduct
> that help is on the way certainly does not mean that
> at all costs the action promised inexorably must
> follow. . . ."); <u>Hines [v. District of Columbia]</u>, 580
> A.2d [133,] 136 [(D.C. 1990)] ("[T]he mere fact that
> an individual has emerged from the general public and
> become an object of the special attention of public
> employees does not create a relationship which imposes
> a special legal duty."); <u>Koher v. Dial</u>, 653 N.E.2d
> 524, 526 (Ind. Ct. App. 1995) ("Standing alone, a
> governmental entity's dispatch of emergency services
> does not create a private duty."). . . .  <u>Wanzer [v.
> Distict of Columbia]</u>, 580 A.2d [127,] 132 [(D.C.
> 1990)] ("A one-time call to 911 for help is not enough
> to establish a special relationship. . . .  To give
> rise to a special relationship, the agency's response
> to the private party must in some demonstrable way
> exceed the response generally made to other members of
> the public.").

805 A.2d at 402-03.

> In our view, acting to protect or assist a "specific
> group of individuals," sufficient to create a special
> relationship, involves more than general actions taken
> to serve members of the public at large in need of
> emergency telephone services.  To find otherwise, by
> equating a duty to act with the provision of a general
> public service, might jeopardize the availability of
> those services in the first instance.

Id. Because the Court of Appeals found no affirmative action,

it never reached the issue of reliance, unlike the Court of

Special Appeals.

More recently, in McNack v. State, 920 A.2d 1097 (Md.

2007), the Maryland Court of Appeals again applied the Ashburn

test, this time to claims arising out of the firebombing of the

home of a family that had placed over 100 emergency calls to the

police complaining about drug dealing and related activities in

their community.  Repeating the holding of Muthukumarana that

"neither a dispatcher's receipt of a call for help nor the

dispatch of emergency assistance alone creates a special duty to

the person in need of such assistance," the court concluded that

"the fact that the 911 calls were answered numerous times and

the police were dispatched numerous times does not alter the

application of this rule of law."  920 A.2d at 1110.  Because

there was no indication that the police "acted in any way

differently than they would act responding to any complaint of

any other member of the general public," there was no

11

affirmative act on the part of the police to give rise to a special relationship.  Id.  "They responded generally."  Id.

Here, the Court must conclude that in the case at bar Defendants took no affirmative act (as the Maryland courts have understood that term) to give rise to a special relationship.  A 911 call was received and a response team was dispatched.  It never reached the Boughter family.  As the Maryland Court of Appeals has made clear, that is insufficient to create a special relationship.

Implicitly acknowledging that they need something more to take their case outside of the holding in Muthukumarana, Plaintiffs characterize this as a situation where the emergency responders actually arrived at the scene, "began the process of rescuing the Boughter Family and then inexplicably abandoned those rescue efforts."  Opp'n at 8.  See also, id. at 10 (describing Defendants' actions as a "failure to complete rescue efforts (after performance of the same was underway)").  The Court finds this to be a mischaracterization of what Plaintiffs alleged occurred.  While Plaintiffs contend that this was somehow a rescue effort halted in midcourse, it is certainly more akin to a situation, like Muthurkumarana, where responders simply arrived at the wrong address.

In the absence of a special relationship between the
Defendants and the Boughter family, there is no legally
recognized duty and thus, no sustainable claim of negligence.

## IV. CONCLUSION

For these reasons, the Court finds that Defendants' motion
to dismiss must be granted.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

Dated:  November 19, 2009

13